UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TREY Z. COOPER, | ) | Civil Action No.: 4:11-2553-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| MARTEK BIOSCIENCES KINGSTREE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This action arises out of Plaintiff's employment with Defendant Martek Biosciences Kingstree Corporation.  Plaintiff alleges his employment was terminated based on his race in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 26).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.    The Kingstree Plant

Defendant operates a facility in Kingstree, South Carolina where it produces products made from microalgae. Many, if not most, of these products are used as food additives, thus, it is important that they meet stringent quality standards, including standards for purity, color and odor. For this

reason, Martek maintains a quality assurance laboratory on site staffed with trained analysts. Analysts are responsible for understanding and properly following a wide variety of test protocols on the different types of products produced. Keeping accurate records is an essential part of this testing process, as Martek's laboratory is subject to review by both customers and government regulatory agencies, including the FDA. The Quality Control Lab at Kingstree was staffed with five QC Analysts I, three QC Analysts II, a Senior QC Analyst, and a Lab Technician. Five of these employees were African-American and five were white.  Miller Aff. ¶¶ 2-3.

### B.    Plaintiff's Employment

Plaintiff was hired as a QC Analyst I on February 6, 2006.  QC Analysts at Martek in Kingstree work on rotating 12-hour shifts. While Plaintiff worked for Martek, he also had other independent business interests including a bailbond company and rental property. Pl. Dep. 9-11, 33. Plaintiff's original supervisor was Michael Shepherd. On September 1, 2009, Shepherd moved into another position and Michelle Miller became Lab Manager and Plaintiff's supervisor.  Miller Aff. ¶ 1.

### C.    Plaintiff's Termination

The event for which Plaintiff's employment was terminated occurred on February 25, 2010. On that afternoon, Plaintiff was asked by his supervisor, Michelle Miller, to print and complete a Material Control Specification ("MCS") for Batch 985827F.  Pl. Dep. Ex. 10.  An MCS is a summary sheet containing test results on a batch of product. The tests had already been performed by others with the exception of two tests. Most of the information for the report was "pulled right out of the computer" by Plaintiff.  Pl. Dep. 55.  All Plaintiff was required to do was to look up

previous test results and transfer the data to the MCS form.  Pl. Dep. 59.  Most of the information is recorded in a computer program called "Batch Manager."  Miller Aff. ¶ 4.

Miller personally showed Plaintiff how to retrieve information from "Batch Manager" and put it on the MCS form.  Miller Aff. ¶ 5; Miller Dep. 27-29, 49; Pl. Dep. 55 ("she gave me a brief tutorial").  Plaintiff needed to transcribe them to the MCS form, which he did.  Pl. Dep. 53.  However, Plaintiff could not obtain a color and odor test from the computer.  Pl. Dep. 55.  To perform the color and odor tests, Miller instructed Plaintiff that he needed to pull the actual sample of Batch 985827F from the freezer to check the color and odor of the sample.  Miller Aff. ¶ 6; Pl. Dep. Ex. 11.  Plaintiff admits that he had been instructed by Miller to locate and test the sample.  Pl. Dep. 54.

Plaintiff acknowledges that color and odor were important.  Pl. Dep. 64.  Miller told him that color was important because customers frequently add the product to vegetable oil.  Miller Aff. ¶ 6.  Miller finished her conversation with Plaintiff at approximately 4:00 p.m. She asked him if he knew where to find the retention sample. Plaintiff responded in the affirmative.  Miller Aff. Ex. 2.  Plaintiff admitted in his deposition that he could not locate the sample and, consequently, did not perform the color and odor testing he had been instructed to do: "Q: You never looked at the sample, did you?  A: I looked for it, but I couldn't find it because it wasn't even there."  Pl. Dep. 52.

The next morning, Miller found the completed MCS form in her mailbox and proceeded to verify the data on it.  Miller Aff. ¶ 7; Miller Dep. 29, 31-32; Pl. Dep. Ex. 11.  Miller did not typically verify data on an MCS form completed by someone else but did so in this instance because Plaintiff informed her that he had never completed such a form before and she wanted to ensure that it was

completed correctly. Miller Dep. 31-32. Miller noticed that Plaintiff signed off that he had performed the odor and color tests and had entered the results as "typical." He also signed to confirm that all tests have passed specifications and are released from the Lab. Id. Miller looked for the retention sample to confirm the odor and color test and was not able to locate it. Miller Aff. ¶ 7; Miller Dep. 35). She then called Plaintiff to find where the sample was located. Miller and Michael Shepherd were on the call. She asked Plaintiff where the sample was. After a pause, he said, "You mean the sample from the freezer?" Miller said, "Yes." He then said that another Analyst had told him that the results were usually typical. At that point, Miller asked him if he had actually pulled the sample and he said, "No, I didn't." Miller then asked him if he recalled the conversation that she had with him the previous afternoon in reference to the color and odor tests and he agreed that he did. Miller then asked him if he had just assumed that the results would be typical and recorded it without actually looking at the sample and he admitted that he did. After further investigation, it was determined that the sample in question was not even at the Kingstree site. Miller Aff. Ex. 2; Pl. Dep. 64-66. Plaintiff testified as follows:

> Q: (Reading From Exhibit 11): At this point I stopped him and asked him if he pulled the sample from retention. He replied no I didn't. That's accurate, isn't it? You just testified to that.
>
> A: Hm-hmm. I told her no.
>
> Q: You testified just a minute ago, you were honest with her, that you didn't pull the sample?
>
> A: Yes.
>
> Q: (Reading From Exhibit 11): I asked him if he recalled the conversation I had with him the previous afternoon in reference to the color and odor tests, that we needed to actually pull the sample from retention to be able to record this data and that some of our customers are actually requesting light colored oils. He said yes. Do you recall that?
>
> A: Yes.

Q: (Reading From Exhibit 11): Then I asked him if he just assumed the results would be typical and recorded that without actually looking at the sample, he replied yes. That's true too, isn't it?

A: Yes, sir, that's true.

Q: In the center of the page, second page, same page we're on, Mr. Cooper, page 2 of Exhibit 11, two paragraphs down, it says (Reading From Exhibit 11): an important part of the quality control function is that our customers can rely on our integrity to perform a thorough analysis on the products that they purchase from us. You agree with that, don't you?

A: Yes.

Q: Isn't that a very, very important function of a lab?

A: Yes.

Q: Two sentences down, it says, additionally (Reading From Exhibit 11): we are audited by our customers as well as government agencies on a regular basis. Do you have any reason to dispute that?

A: No.

Q: Have you ever been involved in an audit while you were at Martek?

A: Yes, sir.

Q: How many times?

A: I don't know. I don't recall. Numerous time we would do like mock walk-throughs where people from the plant would just come through and just check for different things or whatever. So we take those very seriously. I wouldn't be able to recall like how many actual we had.

Q: The audits focus on the integrity of the work being done in the lab?

A: Yes, sir.

* * * *

Q: Can you tell me today as we sit here whether you're aware of anyone else in the lab who indicated that they had performed a test when they had not done so on a MCS form?

A: I couldn't give you actual data.

Q: Is the answer no?

A: I couldn't give you actual data. No, I couldn't give actual data, but I can definitely tell you there's been some mistakes made, you know.

Q: Right. I'm sure you've make mistakes?

A: Like I made a mistake, yes, sir.

Q: Yours wasn't a mistake in the sense that you wrote the incorrect number down.

> Yours was a mistake in judgment where you indicated that you had done something
> that you hadn't actually done, is that fair enough?
>
> A: Fair enough, yes.

Pl. Dep. 64:1– 66:20.

Noting Plaintiff's prior performance appraisals and disciplinary issues discussed below, Miller recommended that Plaintiff's employment be terminated based upon his failure to conduct the tests and then falsifying the report.   Cooper Dep. Ex. 11;   Miller Aff. ¶¶ 9-10.   This recommendation was accepted by Human Resources Manager Brian Lee and Human Resources Generalist Tara Boykin. Miller Aff. ¶¶ 9-10; Miller Dep. 52-54.  Plaintiff admitted that Miller never made any racially insulting or degrading remarks to him.  Pl. Dep. 63.  Plaintiff also admitted that his falsification was different than writing "the incorrect number down." Pl. Dep. 66. The integrity of the quality control system depends upon quality control employees doing their best to properly conduct tests and accurately record the results.  Miller Dep. 54; Pl. Dep. 64-66.  Plaintiff admitted in his deposition that he was unaware "of any other person who ever made entries on a MCS form who had not done the tests." Pl. Dep. 67, 70-71.

### D.     Previous Disciplinary Issues

Prior to the falsification incident leading to Plaintiff's termination, Plaintiff had other work performance issues, including another instance of document falsification.  Defendant's Human Resources Director at the Kingstree location, Brian Lee, testified:

> If you look at his poor performance history and other issues, there was nothing
> mitigating to change the recommendation to terminate his employment, that's for
> sure, but besides the other issues that are listed [referring to Lee Dep. Exhibit 6],
> these six issues, this event in itself, the last incident with the deliberate falsification
> of quality documents, that issue in itself was grounds for termination.

-6-

Lee Dep. 68:18-25. The previous disciplinary issues are summarized below:

### 1.    Failure To Follow Instructions

On October 3, 2007, Plaintiff received a written Employee Corrective Action Notice for failing to complete assignments as directed. Pl. Dep. Ex. 13. This related to his repeated failures to complete "time allocation" sheets which were required of all Martek QC Analysts. Plaintiff failed to follow repeated instructions to perform this task and had to be reminded to do so in numerous emails.  Pl. Dep. Ex. 12.  On receiving the October 3, 2007, Corrective Action Notice, Plaintiff responded that the corrective action was "childish and unprofessional" and concluded that "this event are illrelevant (sic) to Trey Cooper doing is (sic) job." Pl. Dep. Ex. 13; Pl. Dep. 87.

### 2.    Tardiness/90-Day Probation

On November 14, 2007, then Lab Supervisor, Michael Shepherd, gave notice to all Lab employees that Martek's policy on tardiness would be strictly enforced in the Lab moving forward. He stated:

> As you all know that Martek has a policy on being late to work each of you has a schedule time you are to be here. HR has now started sending me each month a report noting how many dates you were late in a month. I will be sending a separate email to each individual who was late any, starting with October to address this issue.
>
> Up to now I have not strictly enforced the Martek policy on tardiness, put (sic) this going to change. I will send the email to note it with each individual for a couple of months and let you know where you stand according to Martek policy. Then, with December, I will start enforcing and taking action according to Martek policy.
>
> Kingstree Martek policy is the following:
>
> Six or more tardies in a rolling six-months.
>
> Ten or more tardies in a rolling 12-months.

Pl. Dep. Ex. 15.

On November 14, 2007, Shepherd sent Plaintiff an email telling him his status under the policy. Pl. Dep. Ex. 16. Plaintiff had two tardies in October, and according to Martek policy, he could only have three more in the next four months without action being taken.

Shepherd followed on January 14, 2008 telling Plaintiff, "You had no tardy last month. This month, you jumped to four. With what you had in October and this month, it would have resulted in a written warning for tardy." Pl. Dep. Ex. 16. No action was taken at that time. Shepherd was simply advising Plaintiff of what action would have been taken.

Plaintiff then had two unexcused tardies in February. Pl. Dep. Ex. 17. In the months of February and March, 2008, Plaintiff was late a total of six times, which put him over the limit for a six-month period under Martek policy. As he was already over the six-month limit, he was given a written warning and was placed on probation for 90 days and told he could not be tardy a single time. Pl. Dep. Ex. 18. Plaintiff's response to this action was: "Martek has changed the time on their clock." Pl. Dep. Ex.18.

### 3.    Falsifying Records/Six-Month Probation

In January of 2007, Shepherd sent all Analysts an email emphasizing that they must correctly account for all time off the plant's grounds and failure to do so could result in termination. Shepherd Dep. Ex. 3. On December 17, 2008, Plaintiff received a written Employee Corrective Action Notice from Shepherd for falsifying records. Pl. Dep. Ex. 14. Beginning on December 12, 2008, Plaintiff failed to bring his badge to clock-in on three consecutive days. For this reason, he completed a manual report indicating he was at work from his start time in the morning until the end of his shift. However, a "gate log" report showed that Plaintiff left the plant on December 12th and 13th for

thirty minutes each and again on December 14th for forty-five minutes.  Pl. Dep. Ex.14.

Plaintiff was placed on probation for six months as a result of this incident. This was his second probation period. During this time, he was not allowed to use the time clock punch adjustment form and was required to use his badge to check in and out. He was also required to promptly respond to all emails acknowledging that he read the email and was acting on it, to perform all of his other job duties without reminders and to avoid tardiness and other attendance issues.  Pl. Dep. Ex. 14.

### E.    Performance Appraisals

On September 12, 2007, Plaintiff received a "needs improvement" performance appraisal from Shepherd.  Pl. Dep. Ex. 19.  It was noted that Plaintiff's tardiness had improved somewhat. However, Shepherd noted that Plaintiff needed to pay closer attention to details in the Lab and needed to follow through with tasks he started. Shepherd also noted that Plaintiff had personal concerns, aside from his work, which distracted him and that he must stay focused on Martek business when he is on the job.   Pl. Dep. Ex. 19.

On November 1, 2008, Plaintiff received an "unsatisfactory" performance appraisal based upon his probationary status for excessive tardiness and his failure to follow instructions and follow up on emails as discussed above. Pl. Dep. Ex. 20. Shepherd again noted that he felt Plaintiff had outside concerns on his mind when he was at work and he needed to focus on Martek matters.  Pl. Dep. Ex. 20.

On November 1, 2009, Plaintiff received a performance appraisal that improved from "unsatisfactory" to "needs improvement."  Pl. Dep. Ex. 21. It was noted that his attendance record

improved after he was placed on probation. However, he still needed to continue to improve with paperwork and following up on emails.  Pl. Dep. Ex. 21.

### F.    Other Employees[1]

Nikki Lee, a white female, had been counseled for leaving work early without permission and for being insubordinate.  Shepard Dep. 30, 38-39 & Ex. D.  Both of these offenses are listed as Level II offenses in Defendant's Offense Code.  Ex. C to Pl. Response.

Benjie Spring, a white male, did not clock out on January 6, 2007.  No action was taken by Shepard against Spring.

Michael Shepard sent an email to Dawn Barfield, a white employee, on October 25, 2007, which reads in part:  "You sign off on 77-4364 stating it was complete.  I went in and found that none of the data had been entered into LAB LOG of Batch Manager when you sign off make sure all is done.  This need [sic] to be done when you have a chance."  Ex. G to Pl. Response.  Plaintiff represents that no action was taken against Barfield other than this email.

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.

---

[1]Plaintiff presents these other employees as similarly situated employees outside Plaintiff's protected class who were treated differently for similar behavior.  Plaintiff sporadically cites to the record regarding these employees and their actions.

-10-

Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

A.    Scope and Timeliness of Charge

"Before filing suit under Title VII, a plaintiff must exhaust [his] administrative remedies by bringing a charge with the EEOC." Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir.2000); see also 42 U.S.C. § 2000e-5(f)(1). The allegations contained in the administrative charge of discrimination generally limit the scope of any subsequent judicial complaint. King v. Seaboard Coast Line R.R., 538 F.2d 581, 583 (4th Cir.1976) (stating that a subsequent civil suit "may encompass only the 'discrimination stated in the [EEOC] charge itself or developed in the course of a reasonable investigation of that charge' ") (quoting Equal Employment Opportunity Comm'n v. Gen. Elec., 532 F.2d 359, 365 (4th Cir.1976)); see also Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir.2000) ("A plaintiff's EEOC charge defines the scope of her subsequent right to institute a civil suit."). Only those claims stated in the initial administrative charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir.1996) (affirming the district court's dismissal of some of the plaintiff's claims because they were outside the scope of her original EEOC charge and were therefore time barred).

Furthermore, to pursue a claim under Title VII, a plaintiff must "file a complaint with the EEOC within 180 days of the incident, or within 300 days of the incident if state or local proceedings are initiated." Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir.1997); 42 U.S.C. § 2000e–5(e)(1); National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Here, the 300 day period applies.

In his Complaint, Plaintiff alleges discrimination in hiring and training, Complaint ¶ 7, in addition to his termination. However, his Charge of Discrimination alleges discrimination only with respect to his termination. Additionally, his Charge of Discrimination was filed October 18, 2010. Thus, any discrimination with respect to his hiring in 2006 is untimely. Also, Plaintiff fails to identify when the alleged discriminatory training occurred other than "at the time of hire." Complaint ¶ 7(c). Thus, it appears any discrimination in training is time-barred as well in addition to the fact that it was not contained within his Charge of Discrimination.[2] Accordingly, the only claim properly before the court is Plaintiff's claim of race discrimination with respect to his termination.

## B.    Race Discrimination

Plaintiff alleges that Defendant terminated him because of his race. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff has not produced direct evidence of race discrimination and, thus, must proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case

---

[2]Although these other instances of discrimination are not actionable in and of themselves, they "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered it is merely an unfortunate decision in history which has not present legal consequences." United Airlines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889 (1977).

of discrimination.  Id.  To establish a prima facie case of race discrimination in a termination case, the plaintiff must present facts showing that (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F. 3rd 277, 285 (4th Cir. 2004).  The fourth element can also be met by showing that similarly-situated employees outside the protected class received more favorable treatment, White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004), or other circumstances giving rise to a reasonable inference of unlawful discrimination.  Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination.  Reeves, 530 U.S. at 143.  Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.  Plaintiff has the

-14-

ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

It is undisputed that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was terminated. However, Defendant argues that Plaintiff was not meeting his employer's legitimate expectations at the time of his termination. The three performance evaluations Plaintiff received during his employment with Defendant are inconsistent with his claim that his performance met the expectations of his employers. In 2007, he received a "needs improvement" evaluation, in 2008, he received an "unsatisfactory" evaluation and in 2009, he received a "needs improvement" evaluation. These evaluations were based, in part, on the disciplinary action received by Plaintiff as a result of his excessive tardiness, his failure to follow instructions regarding completing paperwork, and his falsification of his time sheets.

In addition to the performance evaluations, it is undisputed that he failed to conduct the color and odor tests as directed by Miller and then falsified information regarding those tests. Plaintiff argues that, regardless of his conduct with respect to the falsified information, he was not on a "performance improvement plan" or his "third strike" and thus, a question of fact exists as to whether he was performing to his employer's legitimate expectations. Pl. Response p. 5. However, despite this reference to a "performance improvement plan" or a "third strike" rule, Plaintiff fails to point to any evidence in the record that Defendant had in place any sort of progressive discipline type policy.[3]

---

[3]Defendant's Employee Handbook states that "Level II offenses may warrant an employee's termination. Although each case will be considered in light of its particular background and circumstances, the following are examples of Level II offenses (this list is not all-inclusive) . . . ." Pl. Ex. C.

Plaintiff argues that his disciplinary actions and poor performance evaluations were a result of his supervisor "extensively punishing Plaintiff for his shortcomings, while others were given probation and friendly emails." Pl. Response p. 7. While Plaintiff does present evidence that other employees committed Level II offenses, he fails to show that other employees engaged in conduct similar to that in which he engaged.[4] The closest circumstance Plaintiff presents involves Dawn Barfield.[5] However, the record does not disclose any facts or circumstances surrounding the incident involving Barfield. As set forth above, Barfield's conduct did not involve the falsification of test results. In sum, Plaintiff fails to point to sufficient evidence to create an issue of fact as to whether he was performing at a level that met his employer's legitimate expectations.

Additionally, Plaintiff fails to show that he was replaced by someone outside his protected class. In his Response, he argues that, upon his termination, Nikki Lee, a white female who was already employed by Defendant as a Senior QC Analyst, became partners with his former partner. He cites to no evidence to support this assertion. Plaintiff's own, conclusory statements, without evidentiary support, are insufficient to create an issue of fact. See Causey v. Balog, 162 F.3d 795, 802 (4th Cir.1998). Defendant, on the other hand, presents evidence that Plaintiff's position was filled by Jernika Byers, an African-American female."When someone within [the plaintiff's] protected class is hired as a replacement, that fact ordinarily gives rise to an inference that the defendant did not fire the plaintiff because of her protected status." See Miles v. Dell, Inc., 429 F.3d 480, 488 (4th Cir. 2005).

---

[4]It is noted Plaintiff testified that he was unaware of anyone else in the lab who certified that they had performed a test when they had not.

[5]Other comparators are discussed below.

Plaintiff also attempts to meet the fourth prong by presenting evidence that other employees outside the protected class were treated differently for similar behavior.  In addition to the circumstances involving Dawn Barfield, Plaintiff argues that Nikki Lee, a white female, had been counseled for leaving work early without permission and for being insubordinate and disruptive. Shepard Dep. 30, 38-39; Pl. Ex. D.  Lee received 90 days of probation for her disruptive behavior. Pl. Ex. D.  Lee's supervisor at the time was Michael Shepard, and he issued the written notice and probation.  Pl. Ex. D.  Brian Lee, the Human Resources representative, also signed off on the written notice.  Both of these offenses are listed as Level II offenses in Defendant's Offense Code, which also lists falsification of records as a Level II offense..  Ex. C to Pl. Response.

Plaintiff also argues that Benjie Spring, a white male, did not clock out on January 6, 2007, yet the gate records indicate that he left for approximately 30 minutes during the middle of the day. Pl. Ex. F.  He asserts that no action was taken by Shepard against Spring.

Plaintiff also points to Dawn Barfield, a white employee, who signed off on a document stating that a task had been completed, and Shepard sent Dawn what Plaintiff characterizes as a "pleasant email" asking her to make sure all is complete before signing off.  Ex. G to Pl. Response. Plaintiff asserts that Dawn Barfield was not terminated for falsification of records.

To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006).  Each of the employees offered by Plaintiff

-17-

as similarly situated were supervised by Michael Sheppard at the time of their questioned conduct. Although Plaintiff was supervised, and previously disciplined by Shepard, at the time of his termination, he was supervised by Michelle Miller.

Plaintiff argues that the fact that Miller, rather than Shepard, was his supervisor at the time of his termination is irrelevant because the lab manager does not have the sole power to terminate employees. Shepard Dep. pp. 19-20; Miller Dep. p. 14.  Plaintiff asserts that the decision is reviewed and decided within the Human Resources Department and Brian Lee, the senior HR manager, "did not change."  Pl. Response p. 27.  However, "[w]hen a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision...." Hill, 354 F.3d at 290.

Nevertheless, Plaintiff also fails to show that the other employees he discusses engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  First, none of the employees identified by Plaintiff had the amount of performance issues and disciplinary actions as did Plaintiff.  Further, Plaintiff admits that he is unaware of any other employee who falsified data for tests that were never conducted.  Pl. Dep. pp. 67, 70-71.  However, Plaintiff argues that the offenses in which the other employees engaged were also Level II offenses and, yet, the other employees were not terminated.  As set forth above, Defendant's Employee Handbook states that termination may be appropriate for offenses listed as Level II offenses but that each decision would be made in light of the facts of each case.  Here, the offenses of the other employees are clearly not the same as Plaintiff's offenses and Plaintiff's reliance on the categorization of the offenses as Level II offenses is insufficient.

"The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008). Plaintiff has failed to present sufficient evidence to show that the other employees were similarly situated in all relevant respects to satisfy the fourth element of the prima facie standard. Accordingly, Plaintiff has failed to establish a prima facie case of discrimination and summary judgment is appropriate.

Nevertheless, assuming, arguendo, Plaintiff has established a prima facie case of discrimination, Defendant has produced a legitimate, non-discriminatory reason for Plaintiff's termination, that is, his falsification of lab results. The Fourth Circuit has held that an employee's falsification of company documents or records is a valid, non-discriminatory reason for termination. See King v. Herbert J. Thomas Memorial Hosp., 159 F.3d 192, 198 (4th Cir. 1998) (employee's falsification of documents was a legitimate, non-discriminatory reason for her discharge); Blair v. Colonnas Shipyard, Inc., 52 F.Supp. 2d 687, 695 (E.D. Va. 1999), aff'd 203 F.3d 819 (4th Cir. 2000) (plaintiff's provision of false information to his employer was a legitimate, non-discriminatory reason for his discharge).

Therefore, the burden of proof returns to Plaintiff to show that Defendant's legitimate, non-discriminatory reason for his termination was actually pretext for a discriminatory reason. Plaintiff argues that the reason given for his termination is pretext for a discriminatory motive because other employees were not terminated for the same conduct. However, as discussed above, this argument is without merit because Plaintiff fails to show that any other employee engaged in the same or sufficiently similar conduct.

-19-

Plaintiff also argues that Defendants engaged in a pattern of discrimination that affected other African American employees who have also filed Charges of Discrimination against Defendant.  In order to prove a "pattern and practice" of discrimination, the Plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 (1977). Instead, the Plaintiff must "establish by a preponderance of the evidence that racial discrimination was the Company's standard operating procedure – the regular rather than the unusual practice." Id. The Fourth Circuit has cautioned, however, that "pattern and practice evidence has little, if any relevance in an individual disparate treatment action." McClosky v. Prince George's County, Md., 103 F.3d 118 (Table), 1996 WL 726854, at *1 (4th Cir. 1996); see also Warren v. Halstead Industries, Inc., 613 F.Supp 499, 506, n.2 (D.C.N.C. 1985) (holding that "statistics are not sufficient to prove pretext in individual disparate treatment cases").  Aside from Plaintiff's reference to other employees who have filed charges of discrimination, Plaintiff fails to present evidence sufficient to show that racial discrimination was a part of Defendant's normal operating procedures.  Thus, his pretext argument fails.

In sum, it is Plaintiff's burden ultimately to show that illegal discrimination was the motivating factor in his termination. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision. Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000).[6]  Plaintiff must show that a reasonable jury could believe his explanation of intentional discrimination. Id. Plaintiff has failed to meet his burden

---

[6]Plaintiff insinuates that Miller purposefully asked him to complete tests he had never done before on a sample that was not present in the lab and then immediately checked behind him.  This is simply speculation.  Plaintiff presents no evidence to support such a claim.

of creating a genuine dispute of material fact as to whether his termination was based upon his race.

Therefore, summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed below, it is recommended that Defendant's Motion for Summary

Judgment (Document # 26) be granted and this case be dismissed.

s/Thomas E. Rogers, III

Thomas E. Rogers, III

United States Magistrate Judge

January 25, 2013

Florence, South Carolina